JOSEPH C. ANDERSON, PLAINTIFF IN ERROR, VS. THE STATE OF FLORIDA, DEFENDANT IN ERROR.

1. If two parties have been engaged together in an offence, the confession of one of them after the completion of the offence is not allowable as evidence against the other.

2 The *corpus delicti* may be proved as well by circumstances as by positive testimony.

3. Where there is evidence to sustain the verdict of a jury, this court will not disturb the action of the Circuit Court in refusing to grant a new trial, moved for on the ground that the verdict is not supported by the evidence.

Writ of Error to the Circuit Court for Manatee county.

The facts of the case are stated in the opinion.

*Wall & Turman*, and *E. M. Graham* for Plaintiff in Error.

*The Attorney-General* for Defendant in Error.

THE CHIEF-JUSTICE delivered the opinion of the court :

The plaintiff in error and one Charles B. Willard were convicted of murder in the first degree, and on the jury's recommendation to mercy, were sentenced to the State Penitentiary for life. The case is brought here, as his counsel advises the court, solely to present the question whether the evidence was sufficient to justify the verdict. The error we are to consider is the refusal of the court to grant a new trial on that evidence.

The indictment contains two counts essentially the same except as to the parties who were alleged to be present aiding and abetting in the homicide, but plaintiff in error was one of those parties in both counts. The charge is,

omitting formal allegations, that Willard, with a shot gun in his hands, on the 27th of December, 1884, killed Charles E. Abbe, by shooting him in the head, the death following instantly, that the killing was done from premeditated design, and that plaintiff in error was present aiding and abetting the act.

We find on careful examination of the evidence that both from the testimony and confession of Willard it is shown that he did shoot and kill Abbe on the day specified, and that the killing was done under circumstances proving the premeditated design that constitutes murder under the law of this State. Then, we are to enquire whether it is shown that plaintiff in error aided and abetted therein. In this enquiry we will give no effect to the confession of Willard as to any fact in the case, that not being allowable even if he implicated plaintiff in error, but this, it should be said on behalf of plaintiff in error, is not done. 1st Greenleaf on Ev., Sec. 233.

There are three facts to be established, independent of the confession of Willard, in order to make a case of guilt against plaintiff in error, viz: 1st, the killing of Abbe ; 2nd, if that is established, the participation of plaintiff in error in the killing; and 3rd, if that participation is established a premeditated design on his part to effect Abbe's death. As to the first, Morehouse, a witness for the State testified, in substance that about 11 o'clock on the 27th of December, 1884, he and Abbe were working on a boat, when a man came up who was introduced to him as Mr. Willard, the same person then on trial. After a conversation of some twenty-five minutes, the man left. A short while afterwards Abbe and witness went to dinner. Abbe returned to the boat first, and when witness returned he found Abbe picking up his tools, saying they would work no more, but go to the house. This was between one and

two o'clock.  Witness, as he was returning from dinner, saw two men sitting on a log, or pile of lumber, in the rear of a store, called Bidwell's store.  When he and Abbe arrived near the store, on their way back to the house, Abbe, with his head bowed down, not looking up, was fired on. Witness saw two men twenty feet from a corner of the store, one of whom he recognized as Willard, but did not know who the other was.  Willard had a double barrel shot gun raised to his face, which he fired at Abbe, who fell in his tracks twenty yards from where Willard was standing.  Willard ordered witness to get away from there; to run for his life; and he did run.  Looking back over his shoulder, when he had gone twenty-five or thirty yards, he saw Willard go up to Abbe's body and take hold of his heel or ankle and drag him towards the store out of the line of witness' sight.  He gave no further testimony of importance on the subject of the killing, except that sometime afterwards he was shown an old straw hat which he recognized as the one Abbe was wearing at the time—and that, though living within three miles of the place, he had not seen Abbe since (his testimony being given about six months after the event).

Mrs. Abbe, wife of Charles E. Abbe, last saw him about one o'clock, December 27th, 1884, as he was going towards the bay, a half mile from where they lived.  She heard two shots, and a short time after saw Morehouse coming; he was running, and he told her not to go, they would kill her.  She ran to the bay as fast as she could, and saw blood on the ground, where Abbe was shot, and his old straw hat lying there.  Bidwell's store was closed.  She saw a trail leading in a southwesterly direction from the spot where the blood was—it was a fresh trail.  She went down to the beach and found Mr. Cunliff.  The hat shown

her she recognized as Abbe's, and the little round holes in it were not there when he left for the beach. Search has been made in the bushes, on the beach, and in every place for Abbe's body—diligent search, from time to time.

Watson, Sheriff, went to the place where Abbe was said to have been killed about 2 o'clock the night of December 27th, 1884, and found considerable quantity of blood, and a trail where it was very apparent a body had been dragged to the water's edge. The trail began from where the blood was found. The blood was less than twenty paces from Bidwell's store. When morning came he renewed his examination, and found tracks on the side of what was dragged, which were more distinct near the water's edge. There was blood on the trail from where it started to the water. The blood first seen had something in it resembling brain—a white substance, and these were mixed together with hairs that looked gray. The hairs resembled human hair. He found a hat lying near where he found the blood, and the holes in it he recognized as the same he saw in it there. Having often seen shot holes, he would say if they were such they were made by buck shot. There was a considerable quantity of blood ; it was clogged and covered eight or ten inches in diameter.

Riggin, who accompanied Watson, testified about the same.

Cunliff, who was found by Mrs. Abbe on the beach, when she ran down after the shooting, had seen a boat hoisting sail about 2 o'clock that day, and saw it leave to go across the bay, and when Mrs. Abbe came to him it was nearly across. Bay about a mile wide.

There is no testimony except for the State, and nothing in the cross-examination of the witnesses which weakens the force of that condensed in the foregoing statement ; and we think it shows beyond doubt that Abbe was killed

on the 27th of December, 1884, by Willard. The fact that the body has not been found, is sufficiently accounted for by the fresh trail leading from the place where he fell when shot, to the waters of the bay near by, and by the departure of a boat across the bay soon afterwards. That trail was marked by blood all the way, and in the absence of anything else to explain how it came there, the conclusion cannot be resisted that it was the blood of Abbe. If he was not dead, why has he not shown himself to his wife since, or why was he not produced at the trial by the parties who dragged him to the bay, or their disposition of him accounted for other than that given in the confession of Willard that he carried his body three miles out to sea and threw it overboard. The circumstances aside from that confession are sufficient to justify the conclusion that he is dead.

The *corpus delicti* may be proven as well by circumstances as by positive evidence. 3 Greenleaf on Ev., Sec. 30; Whar. Cr. Ev., 326; Stocking vs. The State, 7 Ind., 326.

Our next question is, did plaintiff in error participate in the killing? The evidence as to this shows frequent conversations of his on the subject of killing Abbe, in some of which his language expressed his own willingness to kill him. What he said a year before would have little weight, if that stood alone, but followed, as it was, by similar talk from time to time up to the very day of the killing, it is not to be ignored. Eveline Grantham, who lives about a half mile from Anderson, and who has known him for three years, says she heard him make the remark about a year ago that if Abbe did not leave him alone and attend to his own business he meant to kill him. Another witness, Crocker, says that soon after the fall term of court in 1884, he heard Anderson say that he didn't believe any man would be hurt for killing Abbe, and that he did not

believe a jury could be got in the county to convict any man for killing him, and that he believed the people of the county would assist any one in killing him, and that he believed the Judge of the Circuit would assist both in giving advice and money in assisting a man who would kill Abbe, in getting out of the county. Another witness, Mrs. Alford, says she heard Anderson say he would as soon shoot Abbe as a snake, and that she had heard him say it twice, once three or four months back, and once longer before the alleged killing of Abbe. The first was seven or eight months back. It may have been a year. Another witness, Jones, said he was at a party at Bidwell's house Christmas night, and talking with Anderson about some manufactured stuff in a jug, *aquadente,* and warning him to be careful. Anderson said yes, and damn that old Abbe, he has always been a curse to Sara Sota (the neighborhood in which they were), him and his clique. They have got about to the end of their halter, and they had better look out for themselves ; that Abbe was always in some deviltry, and there was not a judge or jury in the State but would commend the man who would kill him.

It thus appears that plaintiff in error was in a hostile state of mind towards Abbe, and to a degree that regarded the killing of him as no crime.

On the day of the killing plaintiff in error was frequently seen in the company of Willard, and Jones says that while they and others were at Anderson's house Willard was threatening to shoot Abbe, and clear him of the settlement, but said Morehouse was in the way, and he did not want to harm him. Still Willard said he would get away with Abbe that day. Anderson told him he had better not do it ; said Morehouse was there with Abbe, and would get him into trouble. Willard wanted one of the party to

take the gun down to the beach. Anderson took the gun, which was at his house, and put it into his storehouse. It was a double-barrelled shot gun. Soon afterward Jones told Anderson the best thing to do was for all to go off and keep away from Willard, to which Anderson agreed, and said he would stay and keep Willard, and see that he did no harm to any one. This was after dinner, which they had all taken at Anderson's house. About noon Jones left.

We have next the evidence of Eveline Grantham, who says that on the day of the shooting she saw two men after dinner at her mother's house going towards Bidwell's store, whom she took to be Willard and Anderson. It was about 12 o'clock, but she does not know just what time it was. The one she took for Anderson had a gun in his hand. She did not see them very plainly, but knew who they were, though not certain, and had known Willard a year, and Anderson three years. Anderson lived a half mile from where she lives, and she is pretty well acquainted with him. The two men were coming from the direction of Anderson's house. She thinks the hat the man whom she took to be Anderson was wearing was a light brown color. The party with the gun was carrying it down along side of him. As they were going by she saw Frank Jones' boat sailing off. When Morehouse went down towards the store just before Abbe was shot, Jones' boat was gone, and he saw two men sitting in the rear of Bidwell's store, one of whom was Willard and the other wore a slouched hat of a light gray or drab color. The hat Anderson had on when arrested, and which he admitted he wore on the day of the shooting, was shown to the jury. Watson says the track of Anderson corresponded with one of the tracks on the side of the trail where the body was dragged to the

water. When Willard was arrested, there was found with his clothes a bowie knife having Anderson's initials on it, J. C. A.

With this array of circumstances pressing against plaintiff in error, we think the jury had enough to justify a verdict which found that he was present aiding and abetting Willard in the killing of Abbe. His objection to the killing that day, because of the presence of Morehouse, seems to have been overcome after Jones left his house. It can hardly be doubted that he was the other person present when Willard fired, and if he was not assenting to the act it would have been easy to prevent it. That the gun was his, and that the hat he wore, and the track by the trail served to identify him in corroboration of the testimony of Grantham, must have appeared to the jury a satisfactory conclusion, and we cannot say that it is otherwise to us.

Finding that Abbe was killed by Willard, and that plaintiff in error was present aiding in the perpetration of the deed, there remains the enquiry, whether he was moved to do it from premeditated design. We have no difficulty on this question. The evidence already recited to show the state of his feelings towards Abbe, clearly indicates that he entertained great malice. There is further evidence to the effect that for a long time he regarded Abbe as a person who ought to be got rid of; also, evidence of angry disputes between them. Besides all this, there was at the time no hot blood to prompt the act; no recent dispute or conflict, nor any provocation of recent date. So far as appears, the shooting was done coolly and deliberately, evincing a premeditated purpose to kill, and the lying in wait was fully confirmatory of that purpose, and though the shooting was the act of another, plaintiff in error was there

participating in it, and is justly chargable with the same premeditation.

In view of the conclusions at which we have arrived, we think the court did not err in refusing to grant a new trial, and its judgment is affirmed.